Mark Freeman, on behalf of Aerotek, may it please the Court. The issues have been significantly briefed by the parties. I believe that additional discussion in two areas may be of benefit to the Court. This Court in Nickels Aluminum, and in Pace Industries, and in, frankly, all of them. Could you speak up just a little bit? I apologize. Thank you, Judge Moore. The Court, this Court in Nickels Aluminum, this Court in Pace Industries, and, frankly, every case that I have looked at, has indicated that the task that this Court must apply in deciding this appeal is, did the Board correctly apply the law? And was the factual finding supported by substantial evidence on the record as a whole? Certainly, substantial evidence cannot be based on suspicion, surmise, or implication. With regard to the improper failure to consider for hire, I'd like to focus on the General Council's obligation to demonstrate unionanimous was the motivating factor in refusing to hire or refusing to consider for hire. Here, we have argued that it is improperly, or that the Board improperly inferred anti-unionanimous and shifted the burden of proof to the petitioner. This Court in Carleton College versus NLRB recognized that under substantial evidence standard of review, the Court must take into account the evidence that detracts and must view the inherent strengths and weaknesses of the inferences drawn by the Board. The Union and the Board found that the anti-unionanimous was based on inference. So the question then becomes, well, what is the evidence? The evidence and whether or not it detracted or enhanced that finding. The evidence is as follows. The company met with the Union, and specifically Mr. Johnson, who was a known union organizer, to team up together in February of 2011. That's at the judge's decision at page three of footnote three. The company had placed a union member permanently with Interstates. That's at Joint Appendix 608, particularly Mr. Clement. Actually, Mr. Shank testified that he got Interstates as a sustaining client because he placed Mr. Clement, a known union member, with that particular client. The company actually put the resumes on its letterhead, and that's significant because many of the resumes indicated union affiliation. For example, Mr. Tann's resume indicated that he had affiliation with a particular local NSU in this case, which was Local 22. That's at the Joint Appendix at 792. The company has placed union members and affiliates and organizers, or attempted to, on several occasions. We have argued that 18 of 37 people, or 49% were placed, had indicated, or we believed, they were to be union supporters. Now, the board found... Isn't there, though, a difference between a member of the union and somebody who supports the union and these five employees, who I believe there was some evidence that they clearly said they wanted to organize Aerotech? I'm sorry. I missed the last part. Clearly, they said... That they wanted to organize. Yeah, and actually, the board actually makes that distinction because the board actually indicates, even if circumstance, in its decision, it said, even if we assume that Aerotech did place people it thought were union affiliated, it actually said, no attempt to place any employee who indicated they were a voluntary union organizer. So that was the distinction that was being made. However, if we actually look at the record, that just simply isn't the case. That's not supported by the substantial evidence. The ALJ himself found that Andrew Stock was placed after he had demonstrated union organizing sympathies. He wore union stickers and a union t-shirt at Interstates. That's at the joint appendix at 1184 at footnote 10. The ALJ also found that the company contracted Joe Stock, or contacted Joe Stock, Andrew Joe Stock testified openly that he supported union organizing efforts while on the job at the company in August and was subsequently offered a position. So that's the evidence as relates to that. Additionally, the company tried to hire Dave Irwin in August after Mr. Johnson identified him as a union organizer, and he was specifically on the union organizing committee with regard to the efforts of Mr. Johnson to organize the Aerotech employees in this case. Specifically, and I think it's important, at the joint appendix at 881, which I actually pulled that page, there's a letter dated February the 9th that was actually delivered to Aerotech based on the record a month later. I don't know whether it was dated wrong, but March the 9th specifically indicates Dave Irwin as part of the organizing committee. He was contacted subsequent to that in an effort to be placed. So finally, Mr. Hendershot was called and emailed. He's one of the, actually I think there were four grieving parties here, but Mr. Hendershot was actually called and emailed by an Aerotech recruiter. Now he said that he called us back. We say we didn't get that phone call. It's interesting to note that the phone call that we did place was recorded, but his call back was not. But regardless of that, we certainly emailed him as well, and certainly he did not email back. Conversely, what's the evidence on the other side? There's no evidence that management stated it did not want to hire union members or that it terminated union members. In fact, all the evidence is to the contrary. There's no direct evidence of animus, and in fact, there is direct evidence negating animus. An EI specialist actually goes through an analysis on that and talks about the importance of that. This court recognizes general animus is not enough in GSX Corporation, and given that the actual facts of no hostility at all, certainly there's no evidence amounting to substantial evidence, evidence of animus. So what did the board do in its decision in recognizing this? It says, well, we can look to pretext or disparate treatment as evidence of animus. So okay, well, if we do that, let's take a look at Mr. Johnson's resume. That's a JA 865. Mr. Johnson's resume indicated that he was currently employed at $44 an hour. He earned more than $30 an hour for 16 years. He earned $37 in the past 11 years. His average over the past 15 was almost 40. Wasn't there also evidence that he would take anything, including an apprentice job? Yes. But the question, the question is choosing between evidence, you know, don't we pretty much have to defer to the board then? The question is, is whether he was treated differently, not with all due respect, not whether he said he was going to take a lesser position because Airtek's written policies, and rightly so. These, the written policies are at JA 959, particularly C, say, look, we don't want to hire overqualified people. We don't want to hire people, even if he's, the qualifications is different than the amount of money that they want, because overqualified people say they're going to immediately go to the job looking for other jobs, which is a normal reaction to do. Wasn't there evidence that Airtek hired people at wages lower than what they had gotten previously? Well, actually that's the second part of the, obviously on making an analysis between pretext and disparate treatment, you look at Mr. Johnson and say, well, you hired other people having that same circumstance. Well, actually, if you look at those other people that are cited, Mr. North, they say, was making 30. Actually, there's four individuals. Mr. North at JA 684, his application says he wanted 23. He was paid $23 an hour, and his last job was $23 an hour. Mr. Tan was also one of the people that was being compared. He actually wanted 12.50 an hour and was placed at 13, and his last job was 10.50. Mr. Darnell, they said, well, he was making 23 and he was paid 16. Well, if you actually look at the application, he wanted 16 to 18, was paid 16, and he hadn't worked in a year. So circumstances are like, well, is he likely going to stay around because he doesn't have a job? Probably. Charles Crispin was the fourth. He actually, notwithstanding that the general counsel argues that he wanted 20, and looking at his resume at JA 714, he had no desired salary listed at all. And the last listed salary was 18, not 20, and he was hired at 16. So I don't think that if you actually look at the substantial evidence and look at the comparison and actually look at the record, that it bears out that circumstance. I'd like to next turn to instatement. The second issue is instatement and full back pay of Mr. Johnson. Our position is it's not consistent with the act to allow Mr. Johnson to have instatement and full back pay. It stands in direct contrast to the authority and is wholly unsupported by the record. This case, this court in GSX says that we, you... Let me ask you, did you object to the board's use of the unfit-for-service standard? Yes, actually, we did object to the unfit-for-service standard. And specifically, initially, the board accepted and Aerotech responded that Johnson's conduct was malum in se, and the conduct was inconsistent with the duty of loyalty, and he was not fit for further service regardless of what test is applied, and this court certainly has jurisdiction to review the board's analysis on that. That's at the supplemental appendix at 45, and the supplemental appendix at 70 and 73, but I can say... Are you arguing in your briefs that we should use a different standard? Well, the standard, I don't know that it's a different standard, because in looking at all of the case law that... That would be my next question. What's the standard? Well, I don't know that it is. I think whether you call it an unfit-for-service test, or whether you call it a contractual interference test, or whether you call it a business competition test, or whether you call it, no matter what you call it, every single case that I've seen, and the Hawaii case deals with words, deals with derogatory statements, deals with emotion. These cases, every single case I've seen indicates that if there is a threat to the efficiency of the plant, obviously we don't have a plant necessarily here, but if we have a threat to the effectiveness or the continuing operation of a business, then interference with contracts and interference with business relation necessarily is that, I think, as a matter of law. And therefore, it doesn't make a difference whether you look to the North American Dismantling Case, or the Rex Printing Case, or the Marshall Maintenance Case, all of those cases. And every case I've seen that deals with interference with contractual relations, or interference with business relations, or theft of intellectual property, or trying to obtain the internal And as Marshall Maintenance has said, and as Rex Printing has said, it is manifestly improper to require a respondent to employ anyone whose loyalty and efforts as an employee might be affected by his own self-interest as a business competitor. So with regard to that, what are the pertinent facts? The union and the company are competitors. I don't think that's debated. It's page two of the decision. Johnson admits to attempting to interfere and cut out the middleman. That's at the Joint Appendix 1127 to 31, which is the outline, if you will, that Mr. Johnson prepared. And it's a fairly good outline, but he put that into evidence. His own timeline notes that he wants to cut out the middleman and refer union members. Johnson directs others to make recordings to obtain secrets and billing rates and commission rates. That's at JA 337 and 8 and 548 and 9. The judge here, ALJ, found that Johnson's conduct was obviously inconsistent with the duties of an employee and as such disqualified him from receiving back pay and disqualified foreign statement on February 29th. The board below assumed for the purposes of this case that in fact he had a duty of loyalty and he breached that. Thus, Johnson's conduct in approaching Airtex client interstates constitutes willful and direct interference with Airtex contractual and business relations. In North American Dismantling, the board actually has indicated that Section 7 of the NLRA does not protect employee overtures to contractual interference. So the test that the Hawaii Tribune test, well, the test there is, well, when a former employee is accused of post-discharge misconduct after being unlawfully discharged, he is not entitled to back pay if his conduct is so flagrant it renders the employee unfit for further service or the threat to the efficiency of the plant. In that case, the Hawaii Tribune case dealt with somebody who was unlawfully terminated and he went and said, well, the Hawaii Tribune, you have poor news coverage and he said it in a blog and I think he said it in a public meeting. But there was no evidence of efficiency of the plant or the ability of the company to survive and to continue. And the Hawaii case specifically recognizes that natural human reactions may come up and people may sometimes say things. But I would submit that interference with contract and business and stealing trade secrets and intellectual property or the attempts to do so has been and necessarily is the type of conduct that... What were the trade secrets that he attempted to obtain? Well, the trade secrets are the internal pricing structures. Not about wage discussions, meaning, okay, you make $12 an hour and you make $15 an hour and you can't discuss that. It's the internal pricing commission structures that Aerotech uses itself to compete against other similarly situated companies. And how did he attempt to obtain that? Well, that was based on recordings that were made at, I think it was a Hooters or some establishment when he had sent union employees out to tape record and question our employees. And those were the types of questions that were being asked. Does it make a difference that his alleged bad acts occurred after the purported refusal to hire on a discriminatory basis? Well, I think that it makes a difference because that's what the Hawaii standard says. I don't think it makes a difference at all when we are dealing with interference with contractual relations and interference with business relations. And in fact, the Marshall Maintenance Corporation case, which we cite to in our reply brief, actually involved the same thing. Involved a circumstance after the discharge, the discriminanties immediately formed a company to compete directly against their former employer. And given the, and the board held that it would be manifestly improper to require respondents to employ anyone whose loyalty and efforts as an employee might be affected by his own self-interest as a business competitor. I think also in the Rex Printing case, well, actually I've spoken about that. The thing that I think is also important for the court to understand was the general counsel came up with this plan A and plan B in their brief. They said, okay, he wasn't succeeding on plan A in organizing, so he went to plan B. So the contractual business interference is okay and justified once plan A was being impeded. But general counsel argues that he approached interstates only after the company obstructed his organizing campaign. That didn't happen. He placed, he placed eight organizers on the job. He had a protection letter, which is JA 881 in March of 2012. He had, he actually filed an RC petition on the 30th. Mr. Freeman, I see you're well into your rebuttal time. If you want to reserve some, you might want to do it soon. Okay. I will do that. Thank you, Your Honor. Very well. Morning, Mr. Hiller. Morning. May it please the Court, Joel Hiller for the National Labor Relations Board. The protections of the National Labor Relations Act extend to job applicants who express an intention to organize the workplace if they are hired. In this case, substantial evidence supports the Board's finding that Aerotech refused to hire four applicants because they indicated on their resumes that they were going to organize the workplace if they were hired. And the Board's factual findings supporting that violation fit within the well-established framework for refusal to hire cases. The Board found, based on evidence in the record, that the four applicants were all genuinely interested in getting a job with Aerotech. They were all qualified for the positions, the electrician positions, for which Aerotech was hiring, and that Animus was a motivating factor in the decision not to hire these four men. But there was no direct evidence of Animus, was there? Correct. This is circumstantial evidence of Animus, which the Board and this Court have held can support a finding of unlawful motivation. What is the circumstantial evidence in this case? Sure. For example, there's the pretextual nature of Aerotech's profit reasons for not hiring the four discriminatees. For example, there is the wage rate. We heard before about Johnson was paid a higher wage rate on his previous job than Aerotech was paying, but that was the case with numerous other applicants who Aerotech did hire. They all had received a higher wage rate at previous jobs than Aerotech was offering. That was also the case in this Court's decision in Wright Electric, where the profit reason was a wage disparity explanation, an overqualification explanation. How did Mr. Freeman respond to that? He went person by person and looked at their resume or their application and said, hey, they weren't making more. They were either unemployed or making the same, or they got what they asked for. The applications for each of those individuals, they're not necessarily applications. Some of them are entries in the database, in Aerotech's database, show that these men had been paid higher rates than they were paid at Aerotech. Maybe not in every instance. It was the immediately preceding job, but they in the past had received a higher wage rate than Aerotech was offering them. The explanation they gave, this wage rate explanation, was not qualified. They didn't say, well, Johnson was making a lot more than he would be paid here. They just said it was a red flag that he had received more on a previous job. That was the case with these other applicants as well. This kind of inconsistent application of a facially neutral criterion is classic evidence of pretext. What did the application for the four individuals say about, or did it say anything about what wages they would accept? It didn't say anything about what wages they accepted. So the only information as to the four people against whom the union discrimination allegedly occurred was their prior salary history? For Hendershot, Winge, and Jankowski, there was no listing one way or the other of what they had been paid on previous jobs. The credited evidence was that Johnson did not ask for a particular wage rate. Aerotech says that he does, but that's a credibility determination where the board found that he actually did not. And that's because his whole point was to get hired so he could organize the workplace. And if your whole point is to get hired, you're not going to set up requirements that might stand in the way of being hired. So the credited evidence is that none of the four discriminates asked for a particular wage rate. What do you say to Aerotech's argument that nearly 50% of the people they hired were union members at one time? And that they'd even hired a couple people who were union organizers? So I have two main responses to that. The first is, again, that argument is largely based on discredited testimony. Jacob Schenck testified that he knowingly hired union members for the interstate job. But he testified that at the hearing. But he was impeached at the hearing by a prior affidavit that he had given closer to the know that there was anyone, any union members at the interstate job until someone, some other employee at the interstate job told him about it. So not until people had the union members had already been hired and were already on the job. And Kristin Brien, the Aerotech recruiter who was directly responsible for identifying and hiring the candidates for the interstate job. She testified that she didn't know the union status of any of the people she identified. So that's one. It's it's, again, a credibility issue. The second point is the point your honor was making earlier, that there is a distinction between a union member or a union supporter and a union organizer. And the only for in that regard, how about Dave Irwin? Sure. So when Dave Irwin was hired for the interstate job, he was he had not made clear his support for his union organizer status. He was a covert member of this salting campaign. He didn't indicate that he was going to organize when he was hired. There was a later point in August of 2012. So nearly a year after the four individuals at issue here first applied. You're saying that there's no evidence that Aerotech knew that Irwin was a union organizer until well after he was hired? Correct. Yes. When he was first hired, there was no indication that he was a union organizer. He was later listed on this letter that Karen Sulfur Aerotech referred to. And he somewhat later, several months later, in August 2012, was contacted by someone at Aerotech. He was not hired for another job. He was contacted. But there's no evidence that the person who contacted him knew anything about his organizer status because that person, that recruiter was not involved with the interstate job where he had been identified as the union organizer. The Stock Brothers, Andrew and Joe, that were also mentioned before, they were union supporters, but they were not ever put forward as union organizers. They were not listed on that letter to Aerotech listing the members of the organizing campaign. And the subsequent jobs for which they were contacted were not electrician positions. So they would not have been able to participate in any organizing campaign with Local 22 or would not have been a member of a bargaining unit involving electricians because they were not electrician positions. Hendershot, who was one of the organizers here, who had listed on his resume he was an organizer, he was contacted in February by someone at Aerotech, by someone who was not the usual recruiter for the electricians. He was actually brought in from a different Aerotech division. And he called, left a message for Hendershot and sent an email. Hendershot called back twice and was not, no one answered his calls. No one returned his calls. Aerotech now argues that it kind of contests this evidentiary finding. But the only evidence as to that, as to Hendershot's response is uncontroverted testimony from Hendershot that he called them back and left messages and no one ever called him. There's no evidence to the contrary in the record. And also there's, as the board found, that the person who called Hendershot, this substitute recruiter, he did not actually, it was essentially a mistake. He did not, sorry, did not reflect Aerotech's intention to reach out and hire Hendershot. And that is a finding that Aerotech didn't challenge in its opening brief to the court. And so given the evidence of animus, the pretext involving the wage rate, the timing issues that we discussed in our brief, there is a reasonable inference that the true reason is an unlawful one. And that is certainly a principle that has been put forward by the board and by this court on multiple occasions, that when the reason given is false or not actually relied upon, you can, there's a reasonable inference that the true reason is unlawful motivation. And that's what we have here. It's just another in a long line of those types of cases. And because the board found that Aerotech had unlawfully discriminated against these four individuals, it ordered its typical make whole remedy of instatement and back pay. And Aerotech doesn't challenge that remedy as to three of the individuals, Hendershot, Winch, and Jankowski. It's only Johnson. But the burden is on Aerotech to show that Johnson was unfit for service. And that is a heavy burden because it is essentially the wrongdoer seeking to benefit from its wrongdoing. Did Aerotech challenge the unfit for service standard as the correct standard? No, not before the board. They, in fact, invoked the unfit for service standard. They argued that Johnson was unfit for service. So they can certainly argue that now. We, of course, disagree that he was unfit. But they did not challenge that unfit for service is the proper standard. So given that there's at least some evidence that he was involved in taking trade secrets and recording people surreptitiously and competing with this employer, it seems like a bit of a stretch to force them to then hire this person. Just quickly as to the first point, there's not evidence that he was recording anyone. It was Dave Irwin who was recording the part of the conspiracy to do that. Well, he had asked Irwin to record conversations, the point of which was to record someone from Aerotech telling employees not to discuss their wages, which is the violation that Aerotech doesn't contest on appeal. Irwin testified that these other questions about billing rates and commissions were something he was he was curious about. But there's no evidence connecting Johnson to that line of inquiry. As to the two times that he reached out to interstates where he offered to refer electricians directly from the local 22 hiring hall. So that I think is really the nub of the question of whether those two instances render him unfit for service. So the cases about contractual interference that Aerotech cites, the difference is that those all involved pre-discharge incidents. So it's a different question. The question in those cases is whether the employer was justified in discharging the employee who had made overtures to contractual interference. But that's not what we have here. You only get to the question of Johnson's fit for service once you've already determined that Aerotech has violated the law, that it unlawfully discriminated against him. So that is a key difference because it is Aerotech seeking to evade its remedial obligations to the victims of its discrimination. And the reason why it's not a problem, to your question, about hiring him is because the board found that his conduct, the overtures, were unlikely to continue if he was instated. And that is because he only, well for two reasons really, he only reached out to interstates after it had become clear that Aerotech was interfering with the organizing campaign. Seven months had passed since Johnson had applied for employment with Aerotech. Aerotech had hired over 30 electricians, referred them to at least six employers, and without reaching out to any of the four individuals, the only four individuals who listed organizer on their resume. So it's a reasonable inference at that point that there had been discrimination against these four individuals, against Johnson. And so it is at that point that he turns to what is essentially plan B. But if those obstacles to the organizing campaign were removed, Johnson would have no reason to resort to plan B because plan A was still working. And just responding to a point from Aerotech earlier, the first evidence, the first time he went to interstates was in late February. So this was seven months after late July when he first applied. And he was told by interstates, no thanks, we don't want to hire directly from local 22. So plan B wasn't going to work either. So it is perhaps at that point that he returned to plan A and sent the protection letter and filed the RC petition. So that is the explanation for that. It's still, the board's finding is still supported that he only turned to contacting interstates after it had been made clear that plan A, the organizing campaign, was not going to work. And so, oh, so the other reason why we can expect that Johnson's, the overtures to interstate would not continue if he had been instated was, as the board explained, because at that point he would have a great incentive to remain employed by Aerotech because then he would be on the ground and able to organize the employees as was his intent. And if he was going to go around and do things that would get him fired, that would obviously make things more difficult for the organizing campaign. So for those two reasons, the board found that he would not, the alleged misconduct would not continue if he had been hired, or instated. And so that's why it's not a problem for him to be instated as part of the remedy. In all those other cases where the board discussed about how it would be improper to require an employer to hire a, what is essentially a competitor, those all involved, as we were talking about, this kind of pre-discharge misconduct. So it was a different question. The one exception is the Marshall Maintenance case from 1963. And in that case, there was no finding, as there was here, that the conduct was unlikely to continue if the employees were reinstated. Also the board in that case did not cut off back pay, as Aerotech asked this court to do here. And they did not even say that he could not, that people could not be reinstated. They simply gave the employer the option of conditioning reinstatement. So that case is distinguishable. It also is not, doesn't apply the unfit for service standard. So it was, again, kind of evaluated under a different standard than is before the court here. Can I ask kind of a practical question about instatement as a remedy? As I understand their business, they're kind of like a hiring hall. You know, they hire out electricians to various projects that come and go over time. When these instatements occur, do these four people have to be the first electrician used in every project going forward for them? So that, I believe, would be a question for the board's follow-on compliance proceeding. So if the court enforces the board's order, Aerotech then has the option to kind of litigate those practical issues in a compliance proceeding. If it comes to that, they can also just kind of work those out with the board's, with compliance officers in the board's regional offices. So as a practical matter, that's what's going to happen next if the court enforces the board's order. One other point about the kind of unfit for service and the contractual interference point is that in the Hawaii Tribune-Herald case, which uses the unfit for service standard, the employee who had been unlawfully discharged, he made statements about the employer, talking about kind of how bad the reporting was. It was a newspaper. And this was at the time that he was considering starting a rival newspaper. So there was this element of potential competition there, and that was not a hindrance to ordering reinstatement and back pay for the unlawful discrimination. One last point I want to make, unless there are further questions, and that is in the other remedial issue that Aerotech challenges briefly in its brief about the inclusion of remedial language on job applications. And so we argue that they did not challenge that before the board, and so the argument is forfeited before the court. They cite this Ninth Circuit case in their reply brief, Gardner, I believe it's called. But this court, in fact, rejected the very argument they're making in a case called Monson Trucking, which is cited in our brief. And this court in that case found forfeited an argument under similar circumstances as are presented here. So unless there are further questions, I ask that the court enforce the board's order in the remedy. Very well, thank you. Thank you. With regard to Mr. Johnson's actions, his actions in approaching interstates actually undermines the very organizational effort that he was trying to accomplish. He's going to interstates and saying, hey, he's suggesting I'm going to be representing all of these Aerotech employees, but at the same time he's saying I'm going to go to interstates and eliminate that whole workforce and bring in the hiring hall. With regard to the discredited testimony that was just mentioned, that was based on an affidavit that was given where Mr. Shank said, well, I didn't know specifically that they were local 22 union members or, uh, however he believed that. But even if you take away Mr. Shank's entire testimony on that particular issue, the evidence is that numerous resumes themselves, which is documentary evidence, indicate union affiliation. Mr. Stock's resume indicates it. Mr. Joe Stock's resume indicates it at 821. Brandon Strine's resume indicates it at 778. Aerotech's placing its logo on all of these resumes. David Irwin at 658's resume indicates it. John Tan actually's resume indicates the local 22, that's at 792. Whether or not it was him or eight other organizers simply didn't make a difference. It's plan B. He was engaged in interfering with the contractual relations and interfering with the business relations at the same time that he was approaching as a competitor interstates to eliminate Aerotech from the industry. Thank you. Thank you, counsel. We appreciate both sides' briefing and arguments here today. Case is now submitted and will be decided in due course.